Good morning ladies and gentlemen, we'll take the final case of the day which is Ocean Conservancy v. National Marine Fisheries Service. Counsel? Good morning, Your Honor. May it please the David Hinken, and we represent plaintiffs in the policy of the Ocean Conservancy, Turtle Island Restoration Network, Center for Biological Diversity. You seem to be doing pretty well so far, so perhaps you can start with mootness. You seem to have accomplished a good deal of what you wanted. Your Honor, I think this is a classic example of why a case such as this is not moot, when the defendants at the 11th hour cease their illegal conduct. This is a voluntary cessation of illegal conduct, exception to mootness, which is customary for this case. The plaintiffs have no assurance that this conduct will not be repeated. Now which conduct are you talking about? Issuing a permit without an EIS? Issuing a permit without an EIS and without an adequate biological opinion under Section 7 of the Indian Species Act. Which is based in part on an EIS that's originally there. Well, it would not be based on the EIS. It would be typically issued concurrently with an EIS, but two different regulatory schemes under two different statutes with different standards. The biological opinion would demonstrate, if it's adequately done, that the proposed action would not jeopardize the continued existence of any listed species. The EIS, if it's properly done, would simply disclose the environmental impacts and thoroughly explore the alternatives to the proposed action. With an EIS, if it's properly done, the agency could continue with the action, notwithstanding there are environmental impacts, perhaps even serious environmental impacts, as long as the impacts and the alternatives to those impacts are thoroughly explored and the process is followed. Under the Endangered Species Act, it's very different. Without an adequate biological opinion, it shows that the proposed action will not jeopardize the continued existence of any species. The action may not continue in absent an exemption, which has not been issued in this case. What I'm really trying to understand is the relationship. I know they serve different purposes, but the relationship between an EIS and the biological. When an EIS is prepared and a biological opinion is required, are they sort of parallel and would they examine the same things separately, or is the information developed in the EIS considered in the preparation of the biological opinion? Typically, they would be developed in parallel. They typically would be developed using a similar pool of information. However, they are not necessarily prepared by the same personnel within the same agency. The biological opinion has to be prepared. In this case, we have the agency which would be proposing and taking the action of the National Marine Fisheries Service, and it is internally divided into a protected resources office, which is responsible for overseeing the protection of endangered species, and you have the sustainable fisheries part of the agency, which is more concerned with essentially supporting commercial fisheries. Who does the EIS? The latter, whereas the former would do a biological opinion. So what we have in this situation is the protected resources office would be issuing a biological opinion, which would say yea or nay to an action which is being proposed by the sustainable fisheries part of NIST, which would be preparing an environmental impact statement. So there may be some interchange between the personnel and they're looking at the same data, presumably, and they are generally done at the same time, but they are not necessarily connected, and their conclusions can be different, and certainly the legal standards are very different. Yes, so I don't question that, but there are two separate problems. One, the agreement was done, and there is an EIS in progress, and they've given a date now, which means there will be no implementation of this experiment. That's what they say. It may be so. It may not be so. So that's one issue, whether that renders it smooth, the appeal, whether it renders this appeal smooth. The second question is whether, as I gather what you're saying, that the failure to represent that they will do a new biological opinion means that it's not moved. Is that a separate argument? It is a separate issue, Your Honor, and it is simply the representation that is the problem. I assume you don't believe in representation no matter what it is, but it's the fact that there isn't a representation on the biological opinion that makes it a different issue from your first point, which is you don't believe that we should rely on the representation. Well, Your Honor, this Court and the Supreme Court have made it abundantly clear that the mere statement by the defendant that they will do something which they previously did not do, in this case prepare the EIS or prepare the biological opinion, is not adequate to move the case. Is there one actually being prepared at the moment? I'm sorry? Is there not one actually being prepared at the moment? We should not believe that representation either. Your Honor, I don't know whether one is being prepared at this moment. Until a few weeks ago, the assumption was that the Fisheries Service was going to be completing an environmental impact statement in October. In fact, the district court had said do an environmental impact statement. You don't have to do it before you complete your experiment, but do it at some point. The Fisheries Service said, well, Your Honor, can we have a little more time to do it? We would like to do it in October. The court said yes. Well, October came, and now the agency has unilaterally said, well, we're not going to do it until May. So at what stage of development the EIS may be, if any, I have no way of knowing that. They may be preparing one. They may not. But the point is there is no court order or anything other than their statement that they are not going to proceed with the environmental impact statement in place. With respect to the biological opinion, there is not even that. And even if there were, it's clear that even if they were to say today or any other time, we absolutely will do another biological opinion, that does not move the case. And significantly, the issue is not simply the preparation of a biological opinion. They did do a biological opinion the last time. It was simply wholly inadequate. Well, but we can't assume that a new biological opinion will also be wholly inadequate, just because it is the way it is. I think we absolutely have to assume that, absent any other indication, it will be inadequate in exactly the same way, because the district court's interpretation of the law with regard to reviewing the adequacy of that biological opinion was erroneous. And the defendant, in moving to dismiss this appeal as moved, urged that the district court opinion not be vacated. So it seems very clear that the defendant's position is the district court told us once before that our biological opinion was adequate. The district court said that plaintiff was not likely to prevail on the merits of its challenge to the biological opinion. The defendant said, please dismiss this appeal as moved, but don't vacate the district court's opinion, which contains this nice language saying that our biological opinion was adequate. So there's every indication that the next biological opinion, if there is one, will follow the same pattern. And that is the problem. What we're looking for is for this court to not only reverse the district court on its failure to enjoin the action absent the issuance of the environmental impact statement, but to also conclude, as we believe the law requires, that the analysis that the district court used in evaluating the adequacy of the biological opinion that was prepared was erroneous, and that any future biological opinion that follows that analysis will also be erroneous in enjoining any similar action by the defendant until they not only issue an environmental impact statement, but an adequate biological opinion that follows the correct legal analysis. The problem with the legal analysis of the biological opinion, which is a critical issue in this case, is that Section 7 of the Endangered Species Act strictly prohibits proceeding with an agency action unless it is clear that it will not jeopardize any listed species. In this case, the biological opinion that the fishery service prepared, in which the district court gave its blessing to, said that this permit which we are issuing to ourselves, which is designed to catch over 300 listed sea turtles with the expectation that approximately 107 of them will die, will in fact jeopardize the continued existence of several of these species of turtles. However, we are not going to issue a jeopardy opinion, which would preclude proceeding with this experiment. We are going to issue a no jeopardy opinion because we are going to assume that this experiment will in fact be successful, and it will in fact lead to the discovery of turtle-safe long-lining gear. And once these new gears and methods are discovered in this experiment, foreign fisheries from Japan, Taiwan, South Korea, China, etc., in the Pacific, which account for the majority of the long-lining effort in the Pacific, will in fact adopt these new methods in their own long-lining fleets, even though the United States has no meaningful leverage to force them to do so. And once these as-yet-undiscovered new methods are developed and adopted in the long run, these species will in fact be better off than if we don't do the experiment and if we do not cause the deaths of over 100 of them in the short term. Now, it is very clear from this course precedent, specifically in Sierra Club versus Marsh, that you cannot negate the effects of immediate, certain, serious harm to endangered species by basing it on speculative future benefits. In Sierra Club versus Marsh, the court said that mitigation that offsets harm for purposes of a Section 7 jeopardy termination, the agency must, quote, make certain that the mitigation will occur. And the risk of failure must be borne by the project and not by the species. District courts following this line have said earlier this year in the National Wildlife case, the court said the regulatory standard for using mitigation to offset jeopardy is not a reasonable chance that the harm will be offset by mitigation, but reasonable certainty. In 2002, another district court following this line of cases said, the mitigation must be reasonably specific, certain to occur, capable of implementation, and subject to deadlines or otherwise enforceable obligations. So the standard, whenever you have an impact which would otherwise jeopardize a species, but you want to proceed anyway because you feel there is a mitigation which is going to offset that, the standard is very strict. And in this case, the benefits that the agency was arguing and the district court included would offset this harm, which, again, the agency acknowledged in their biological opinion, would, absent this mitigation, jeopardize the continued existence of these species of sea turtles. The administrative record shows that this mitigation, far from being certain, was at best an educated guess. And, in fact, there is ample evidence in the administrative record that they already knew before they issued the permit that some of the most important or the methods that they wished to test that would cause the deaths of the most turtles actually had been proven not to do it. There is a very similar experiment that has been ongoing in the last couple of years in the Atlantic by the same agency with the same purpose. It's just in a different place. And they'd already tested dyeing the bait blue to see whether the turtles would avoid it or wouldn't notice it. They discovered it didn't work. It just doesn't work. And they told the folks who were putting together the experiment in the Pacific, if this doesn't work, you might want to try something else in your experiment. But the folks who were designing the Pacific experiment put it in there anyway, even though they knew that it didn't work in the Atlantic, and even though the most critically endangered species of sea turtle that is at issue in the Pacific, the leatherback sea turtle, everyone knows that they don't typically go for the bait anyway. They get tangled in the lines because they don't eat the bait. They have a different diet. They're not interested in squid. So they knew that they were going to be killing leatherbacks, testing something that just didn't work and couldn't help leatherbacks anyway. And NIST's response to this is, well, just because it didn't work in the Atlantic doesn't mean that it won't work in the Pacific. That may be true, but that is very far from the legal standard We're issuing a no-jeopardy opinion based upon future benefits. So we have a very dangerous situation here where an agency that is supposed to be responsible for conserving endangered species is issuing to itself a permit that not only risks harming turtles, but is actually designed to catch hundreds of them, knowing that over a hundred of them will likely die, risks jeopardizing their continued existence, and then justifies it by saying, well, we don't know what else to do. These turtles are in trouble, and if we don't do this, maybe they'll go extinct. Well, the problem here is there are alternatives to doing what they were doing, and I discussed these at length in my briefs. There are a number of different alternatives to doing this experiment in this way, but of course they haven't examined them because they've never done an environmental impact statement. Now they are. That's the question. But you assume they are doing an environmental impact statement at the moment, but they're not going to issue a permit or a biological opinion until after that's done. Isn't it plausible that they will consider the things you're talking about? Maybe they'll reject, but they'll at least consider the things they didn't consider before? There's two issues there. First, plausibility, I would submit, Your Honor, is not a test. They may do any number of things. So let's say isn't it reasonable to presume they'll consider those things? No, Your Honor, I'd have to say I don't believe it's reasonable to assume that. This permit was issued as a result of very intense political pressure by the Hawaii-based swordfish longlining industry, which is currently banned from fishing out of Hawaii, specifically because of the impacts of that industry on endangered sea turtles. That is why this permit is being issued, is to try and reopen that fishery. I make no assumptions about what the agency is going to do. Your Honor, I asked whether they wouldn't consider it in their report, in the EIS, whether they wouldn't consider the kinds of things you're talking about. I didn't say isn't it likely that they would agree with it. Well, as I said, they may do an EIS, and they may consider any number of things. But the point is, is the case moot simply because they may not repeat their illegal conduct? That's not the test. The test is have they shown that it's very clear that they will not repeat their illegal conduct? Have they shown some kind of— Sure. It would not be moot unless they could show that they would reach a particular result. The question is, is it moot if they're going to make a new decision based on new circumstances? And you say that's not enough reason to hold it moot. It would only be moot if it was very clear that they will not do another experiment that is substantially similar to this last one without first doing an environmental impact statement and without first preparing the biological opinion that follows the correct legal analysis, rather than the faulty legal analysis that they followed last time. And there is absolutely no indication that the government acknowledges that its legal analysis that it followed in the biological opinions last time was faulty. In fact, as I say, there's every indication that they are happy to follow it again. They view the district court that hasn't given them a green light to do exactly the same thing again that they did last time. And then we'll wind up arguing this exact same issue before this court. On the permanent injunction, that's the problem with this, the preliminary injunction. And although we might fault the district court's analysis on that, it may not be necessary to reach the issue presented by the preliminary injunction that you want us to reach. But there's no assurance without... Right. I'm sort of jumping the gun on this, because you would have the opportunity to make the same argument on presumably an issue, an EIS that contains the faulty biological or wasn't faulty biological data. You could make the same argument on your next appeal. Well, the question is, is it moot? And whether it would be a waste of all of the resources that have gone into preparing this case and litigating it for the past year and a half and briefing it and coming here today on the hope that... If relief is granted on a different ground other than the legal error, then we don't need to reach the legal error. I know you'd like us to, and maybe it's sufficient to, but that alone may not apply to the movement of counsels. Well, the question is whether... The only issue with mootness is, does the court have the authority to do it? And I submit clearly the court does have the authority to decide the case, because it is not clear. It is not absolutely clear that this behavior will not occur in the future. And every time courts have looked at this, they have come up with various tests, have the defendants shown that they acknowledge the illegality of their conduct. In this case, clearly not. The defendant has adamantly resisted entry of judgment against them in the district court, even on the NEPA claim. Adamantly resisted. The district court has, frankly, resisted the same thing. The plaintiffs moved for summary judgment so that the matter could go to final judgment and an appeal could be taken for judgment in the district court, and the district court has stated, pending this appeal, so that matter can stay now for some six or eight months. The district court has indicated that it thinks the entire case may be mooted, although I think that is clearly incorrect. If that happens, then we must first appeal from a dismissal, and then we go back to the district court if we prevail on that appeal, and then we move for summary judgment again, and then we have the same, very possibly the same result, since there's no indication that the district court considers that it's prior. The ruling was incorrect in any way. And then we're back before this court all racing the clock before, once again, the defendants start the experimental fishery, which we had a difficult enough time the first time that they started the first phase of their experiment only one month after they issued their permit. I hate to say this, but that's not unusual in environmental cases, because it's kind of a risk of protracted litigation to occur, you come up with a preliminary injunction, perhaps the district court is reversed, the action is saved, the defense is secure, perhaps a new EIA has to be done. I mean, well, the fees get chopped down usually. But here, you're doing pretty well, I'll tell you that. This is not kind of – they really aren't problems with the lumber. By the time you get up, even on the preliminary injunction, the harm is all done. Here, you're doing quite well. You're off for another year. But we face precisely the same problem when the next permit is issued that we face right now. And so the question is, should we simply wait until that happens, or should we resolve the issue now? If the matter – if the court's hands were tied, that would be wonderful. But I think it is clear that the court's hands are not tied. I think one thing is different about this, that the courts have had some education in this problem by now. And let's assume the EIA is done, because I think that's a reasonable assumption, whether it is from a legal standpoint or not. Let's assume there's an EIA that's moved tactically, not the important one about whether the permit is properly issued because of a biological opinion. And then there's a new permit, and the question is, is there an adequate biological opinion? Because it won't take you very long to get into court to see if there's any consensus on that biological opinion if you don't agree with it. You've got all the legal theories to go on. Then if the district court – if they follow the same theory that the English do, and assuming the EIA doesn't change matters and that you end up with the same basis of biological opinion, which we don't know if that's what it would be at all. If it is, you're going to be moving very quickly to the district court, and you've got a fair amount of precedent to apply now to your appeal. And we now have a panel that the appeal would come back to, which is familiar with the issue. And I think it can be dealt with rather expeditiously next time. I understand that normally it's not that way. You go through a motions panel. It takes a while in the preliminary. But you have a – we now have a case, and we have a panel. And I think we will be reasonably capable of dealing, I hope, with that expeditiously. Your Honor, my assumption is that the next permit will have to be the subject of a separate lawsuit, which very likely would get assigned to the same district court judge, but not necessarily. And whether an appeal from that lawsuit would come to this panel or another, of course, Your Honor, you know better than I do. No, no, if it's a separate lawsuit, then it might not. I think it would need to be, but it would be – it could very well be a substantially identical permit. There is no reason to assume that the permit will be any different. In fact, the notice of intent to prepare EIS that the agency sent out some months ago said that they are preparing to do an EIS for another action, which will be similar at least to the permit that they withdrew. So we're looking at going through this entire process over again without any assurance that we will be able to get it reviewed in time. And it is because of this precise problem that the voluntary cessation of the legal conduct doctrine exists so that plaintiffs like my clients are not put in the position where a defendant has the power to preclude review by the expediency of withdrawing an illegal action at the last minute and then saying, well, if we do it again, you can come back. That's always the case. But that's why the doctrine exists to prevent that my clients from having to run back into court time and time again. And if they withdraw their permit again in the same way they did the last time, two days before they would file their appeal brief, then what? Then we're going – then is the argument the same? Well, if we do it again, you can always come back. That is a truism, but that's why the doctrine exists so that review does occur. All right. Thank you, Senator. I think we've given you double the time. I appreciate it. Oh, no, I'm sorry. We haven't. Yes, we have. Okay, we'll still give you a couple of minutes for the vote. Thank you. Good morning, Your Honor. I'm Kathleen Hatcher here on behalf of the National Marine Fishery Service, and I'd like to give seven minutes of our time to the Hawaii Longline Association Council. I wanted to clarify a few points based on Ocean Conservancy's statements in the argument. First, I wanted to clarify the relationship between the EIS and the biological opinion. The EIS is prepared first. The EIS being prepared now is considering eight alternatives, and at the end of the EIS process, the EIS is not being prepared by the Office of Sustainable Fisheries, just as the environmental assessment was not prepared by the Office of Sustainable Fisheries. It's being prepared by the Office of Protected Resources. As you can see at Chapter 20 of the Administrative Record, we need to file Administrative Record 1203 if the EIS is prepared by the Office of Protected Resources. Once the EIS process is completed and the agency has evaluated alternatives, the agency then selects the most favorable alternative, and then a biological opinion is prepared on that proposed project. So at this point, there isn't even a proposed research project. There is merely a notice of intent which needed to use something as a description of research for purposes of scoping and considering alternatives, and that's why the notice of intent describes the research as the research that has been submitted. But as the declaration of Mr. Hogarth explained, the agency is now considering eight alternatives, including many that address issues raised in this lawsuit, and the EIS is expected to be done by May 1, 2004. Why didn't you seek an extension time in the district court? I mean, the time to prepare the EIS has expired. You're now in violation of the court order. Unless there's the supplemental record. Well, the declaration was filed in the district court, but we aren't in violation of the court order because we aren't doing any research under Phase 2, which is what the district court enjoined. What the district court did was enjoined Phase 2 of the research pending completion of the EIS. Right, but then you sought an extension of the time which was filed the EIS before. Before we withdrew the permit while we were still planning on carrying out the research. So is it your opinion, is it your judgment now that you don't have to go to the district court to seek an extension? You're under no constraints in the district court with respect to the EIS preparation? We are under constraints and our understanding of our position in the district court is that we are under a constraint not to resume research under Permit 1303 until an EIS is completed. And the district court further conditioned the denial of the preliminary injunction in that the district court authorized us only to continue research on Phase 2 according to the schedule presented to the district court when the district court entered the order. That's no longer possible. So there's no circumstance under which the National Fisheries Service could continue, even if it revitalized Permit 1303, which it has been doing. It still is now under an injunction. The way we understand the district court's order is that we are under an injunction from continuing research until an EIS is completed. So let me ask you this question. Let's assume that I understand what your intents are and you've expressed, but let's say that regardless of these good intentions that you've expressed, that your agency decides to issue a permit notwithstanding all of our contemplations in the next couple of months. Wait just a second. What does Mr. Achutosh mean by that? Well, we would be in contempt under the district court's order if we did that. I don't see how that is. I mean, the district court didn't necessarily enjoin it. The only reason this appeal is moved, or potentially moved, is that you said you're not going to issue the permit without doing an EIS. You're doing an EIS. You plan to complete it. And now you said that this appeal is moved. Well, if we say that's true, we've got the representation to violate that, I'm not sure that Mr. Achutosh has a remedy. Well, let me respond to two issues that seem to me to be concluded here. One is whether the appeal from the denial of a preliminary injunction is moved, and the other is whether the case is moved. We see those as separate issues. Sure. The remedy for a denial of a preliminary injunction is to enjoin the action. It's not declaratory relief, which is what Mr. Achutosh is going to be seeking. There's nothing to enjoin now. The agency has withdrawn the permit. It can't issue, as we understand the district court's order, we can't resume research under that permit until an EIS is done. We've told the district court we won't. We're under a district court order not to. And we won't. It's unrealistic, unfair, and reasonable to assume that the agency will do something that it thinks it can't do and has no intention of doing. And, of course, there are reasons for that. The second part of it is that even if you do a new EIS, there's a basic legal dispute over the proper approach to the biological opinion. If you want to follow a legal theory and a district court agrees with you, that would result in an unlawful permit. And if that issue won't be moved, it's still there. And there's nothing to indicate that that will not continue to be a legal issue. We believe that that legal issue goes to whether the merits of the case are new, not to whether it appeals in the denial of the EIS, but overcoming that petition. As to the challenges to the biological opinion, we believe that the district court didn't abuse its discretion in reaching its decision and that there will be a new EIS because there will be, if there is any new research permit, it will be based on new information that wasn't analyzed in the previous biological opinion. And that was the reason that I didn't seek an extension, but it's extending the deadline for doing the EIS. Are you stating that in the normal practice the biological opinion is based in part on the EIS? It's based on the proposed project that comes out of the EIS analysis, which will include analysis of the environmental effects of alternatives. And that all relates to the not likely to jeopardize determination. Because as we understand Ocean Conservancy's objection, they share our concern about the turtle species. And they share our view that unless the foreign feed bycatch is reduced, these turtles are not going to survive in the Pacific. They'll be extinct. So we disagree on the appropriate method for developing techniques that will reduce the bycatch. But they share our view that unless research is done and unless the U.S. does it, because we can't expect that another nation will do it, and tries to export those techniques to the foreign fleet, the turtles will become extinct. So that's what's motivating us in doing this research. Well, that puts it back up to the legal point of all this. Let's just say that at the end of your EIS, your preferred alternative is the same one that has been proffered previously. Under that scenario, will a new biological opinion be prepared? It will have to be prepared. Why is that? Because there's recent research out of the North Atlantic. Let me put it this way. I understand the practical implications of why it ought to be prepared. What legally requires you to prepare it? 50 CFR 402.02. I'm sorry. That's the wrong site. That's the jeopardy definition. 402.16 requires preparation of a new biological opinion when there's new data and information and reveals the effects of a proposed action not previously considered. And that's the judgment call, correct? Well, if you say, well, we have this new data, but it's not really relevant to this, it's a judgment call on whether or not a new biological opinion is relevant. Well, that could be a legal dispute. I mean, NEMS believes it needs to prepare a new biopsy. I guess we're not communicating. It's probably my fault. I mean, I'm trying to understand the parameters of the problem, I think. But the question is, what you're understanding, what you think you're going to do and what's likely to happen, to me that's somewhat different from what's legally required to do. In the past, your agency has taken actions on paired EISs and relied on old data. We've seen it other cases. Even though the argument has been there's new data out there, you have to consider it was an error to consider the new biological report. You're saying it has to be adapted. What you said to us was a new biological opinion has to be prepared. Right. The way I interpret it is that that is a judgment call on the agency. The agency is required to look at whether or not there's new data. You say, well, there's new data. Therefore, it has to be. Are you representing the source today and binding admission that it will be done? Yes, as we did in our brief on page 30, that there will be a new biological opinion that would accompany any term. So why are you opposing the entry of a preliminary injunction if you're saying we can do all of these things that claimants have asked the court to force us to do? Why not just allow the preliminary injunction to be issued and give them an enforceable method of monitoring the situation? That would seem to, in some sense, order to solve everyone's problems. Well, except that we believe this is moot, and that would raise questions to us. If I understand, you have no legal objection to anything that the claimants are seeking. Is that what you're saying, except the fact you're saying it's moot because we're going to do it? No, it's moot because there's nothing to enjoin. There's no permit. There's no way the agency can proceed to carry out the research, which is what the preliminary injunction would have done. So we can go back. The court can say this is moot. We can go back. We can raise the merits in the district court. We might think some issues are moot. They might think they're not. The district court can resolve that. And if the district court concludes that the merits are not moot, then Mr. Ashutosh can have his legal issue decided. Is it your position that because you withdrawn the permit and you're going through the new procedures that the entire case is moot? It is argued that the entire case is moot. The district court might not agree with that. So you'll ask the district court to dismiss the entire case? We would, yes. If the district court agrees with it, that would be appealable also. This court has rendered many decisions on whether a case is moot or not and reversed many district court determinations. Maybe it would find declaratory relief would be available. Maybe it would find one of the legal issues, the buyout perhaps, falls within the capability of that petition to be reviewed or the voluntary citation exception. But that's not before this court, you know. Well, it isn't, Sam. The point is if we reach down far enough into the question of a declaratory injunction and we do, it's a legal issue. We could. There's nothing that prevents us from doing that because that's part of the order. Now, whether we want to or not. If the PI isn't moot. I mean, what's to enjoin? What effective relief would be granted by enjoining anything? There's nothing to enjoin. It's usually voluntary to stop your activity. No, the district court's injunction. The district court didn't order you to withdraw a permit, did it? No. You took that action based on your conclusion of the legal impact of the court order, correct? No, we withdrew the proposal because we couldn't proceed in 2003, and we thought since we should do an EIS anyway, let's do the EIS and see what comes from that. But the district court enjoined denying the PI only to the extent that we could proceed. It's very narrow. The only way in which to proceed was to proceed with phase two on that schedule. Since we didn't do that, we believe that we are now enjoined until we complete an EIS.  It's an unusual denial of a preliminary injunction. I grant that. It's given that the district court required us to do an EIS. That's the way we read it. It required us to do an EIS if we wanted to proceed with research. We believe we are now under an injunction from the district court, as well as an injunction from the district court, on prohibiting research. Let me put my question a different way. Let's say that there's a new legal interpretation by your department as to the injunction. I understand what yours is. But if some new counsel in your direction came in and said, well, no, no, that doesn't prevent us from putting the permit back in place, we could go ahead with that. It doesn't reach that far. Again, I come back to my original question. To me, that's the question. What is Mr. Achatot's remedy if you change your mind? As to your interpretation of what the district court ordered. Well, and the district court also, its interpretation of the court order. I mean, the district court had told us that there's no way we could proceed under this permit unless we were doing an EIS. Well, let me put it this way. When I read the district court order and I read your brief, I thought, well, there's a way that this can proceed. Mr. Achatot thinks there's a way you can proceed. You don't think there's a way. I don't. I'm sorry. Could you explain to me how we could proceed under this? I don't think how we could proceed and revitalize this research, given the district court's order, which allowed us only to proceed with phase 2. No, I think so. But we're talking about the permit, which you voluntarily withdraw. And you say you don't think. You could have kept the permit in place. You didn't need to withdraw it. Enjoying certain activities. Let me address. You know, this isn't an unusual sort of situation where people come in and argue, well, look, we're not going to shut down all of the treaties. We're not going to. We've had this situation before, and so we're going to stop that. And the net result is, and that's why we're worried about movements, is if we deprive the plaintiffs of their one remedy, which is an appeal from the preliminary injunction order, they have no means. If you change your mind, if you change your actions, you don't think you can, but you don't want it in writing. You don't want to be enjoined. They're deprived of their one remedy. This is it for them. We believe we are enjoined. If this court wants to enjoin us, we don't have a problem with that either because we're not going to do anything. We don't think we can proceed. What we do have a problem with is the legal argument concerning the buyout. And we think Mr. Astertoff is wrong about that, that the medication standards apply to the procedure. You don't have any objection to an injunction by this court because you may not conduct the experiment until Astert is a new EIS, new buyout, right? As a practical matter, we have no problem with that. As a legal matter, we think it's smooth, so we have no problem with that. But as a practical matter, no, we don't because that's not problematic. Our only problem is if this court reverses the district court's interpretation of the law regarding the buyout. I understand that. You don't want us to reach the merits of that legal court and make a determination on that issue. Exactly. All right. All right. We'd better give you a call counselor sometimes. You have used 21 minutes and 10 seconds out of 20 minutes. Thank you. We'll give you 10 minutes. Thank you. Good afternoon. Good afternoon. Is it too quiet? Yes. Okay. I can speak up. I was a little shy by the echo that I was hearing earlier, so I think I was speaking down because of that. Again, I don't think you heard it quite. Okay. No, but it's much improved. Okay.  Well, I'll repeat that. I wanted to briefly address the issue of the EIS. That's very good. The Long Line Association's interest in this case, and then second, the merits of the Ocean Conservancy's Endangered Species Act arguments, which are particularly troubling in that they advocate an interpretation of the ESA that would effectively preclude research for these species and for other seriously declining populations. I believe it is important to understand at the outset what this case is about. It's not a simple matter of species versus industry. On the contrary, this case is somewhat of a paradox. All of the parties here, including the conservancy, agree that by-patch reduction by the foreign seed grading in the Pacific is necessary to save these species, and I believe there is further agreement that the most likely means of achieving this goal is through the type of research that has been proposed here, and yet the so-and-so here are arguing against the permit. You might wonder why. Well, the conservancy has, for a number of years, been engaged in litigation aimed at closing the local longline fisheries, and they explained to the district court that they oppose this permit because they view it as benefiting industry, and in a sense, it does. The purpose of the permit is not to eliminate longline fishing. The purpose of the permit is to make longline fishing safer for sea turtles, and under the ESA, as the status of the species improves and as the fishery is able to reduce or eliminate its impact, it will likely be permitted to deploy more effort. So that is the basis for the fishery's support for this permit and apparently the basis for opposition. Ironically, the conservancy has conceded in this case that closing the local fishery will not make a difference, and there are two reasons for this. First, the fishery is simply too small to matter. It's comprised of about 100 highly regulated vessels, and its total catch is only about 2% of the total Pacific Atlantic effort. At the same time, there's a very steady international market demand for tuna and swordfish products. So what NIMP has recognized is that closing or severely reducing the domestic supply merely results in those buyers looking other places to fill the same market, and that those other suppliers are the foreign fleets in the Pacific, and they are much less regulated with respect to sea turtles than the domestic fleet. And NIMP data shows that the foreign fisheries cause anywhere from seven up to 960 times more injuries and mortalities to sea turtles per metric ton of fish. So the purpose of this permit is to combat that problem by developing and demonstrating the efficacy of improved long-running methods that will reduce bycatch that can both be used domestically and exported to the foreign fleet. The solution does envision a cooperative effort with industry, but that does not make it unlawful. Now, briefly, I would like to address the merits of the ESA argument. As I said, I believe these are very important. They're somewhat of a matter of first impression here. There's not a lot of case law evaluated. How does the Jeopardy standard apply in the research context and in the context of a seriously declining population that is basically threatened by international problems over which the U.S. does not have direct authority? Before you get to that, let me just ask you quickly. The Council states that aside from the mootness issue, which we have to consider, that she had no objection to an injunction that would prevent any experiment until there was a new EIS, a new biological opinion, and a new decision on whether to issue a permit. Do you agree with her on that? Well, in a qualified manner, I guess the problem would be the same problem that Ms. Hazard has, in that it is a legal matter to do that. You know, it's the likelihood of success on the merits standard, and to the extent the court has already found that an EIS is required, no, in that case there's no objection. We feel fully confident that NIFS will follow the law and will complete the EIS and will do the biological opinion, which I also believe for the same reasons Ms. Hazard stated. The ESA has a best science requirement, best available commercial data to consider, and as Ms. Hazard said, there is new data available from the specific, and I believe that they will consider that in making a decision. There's also some question as to whether the permit will reissue. I mean, this matter is very much in flux. The regulatory situation is somewhat in flux. It's not directly related to the district court in Columbia that actually set aside the biological opinion. There are many questions. There is a serious question whether the permit will even reissue, let alone in the same form. So I agree with Ms. Hazard that the likelihood test as far as the identical permitting issue with the identical problem is a very speculative proposition. Did I answer your question? Yes, thank you. Probably more than answered it. Now you'd like to talk about the merits of the endangered species. Well, I just wanted to make a few points, and again it's because we feel this is a very, I would say, unfortunate interpretation of the ESA that would preclude research. I believe the conservancy is attempting to insert a certainty requirement into the ESA that is, in fact, not contained in the statute. On the contrary, in Section 10A1A, that's the research section, Congress expressly authorized research that would involve the case of seriously endangered species. And, in fact, the ESA recognizes conservation as including programs of research. So Congress, I think, recognized that often the data, the knowledge, and study of a species is integral to devising effective conservation measures, and that research is inherently uncertain. If NIFS could guarantee the results of its research, it would have no need to conduct the research. So that would be an arbitrary take of a turtle for no purpose. There has to be some uncertainty in research. And then I believe the question becomes, well, how much uncertainty is acceptable? And I would submit to the court that in this very subjective and yet scientific decision, the court government should be at its greatest. Here, NIFS evaluated the need for the research, the risk of failing to act, and, in fact, the conservancy has agreed that if NIFS takes no action, just does nothing, the species is likely to become extinct. NIFS evaluated the probable impact and the probable benefits, and it also factored into its evaluation the intangible benefits of the research itself, in other words, of the data. And I don't believe that can be overlooked here. NIFS actually has identified a lack of reliable data concerning these species as a threat, because, again, it hinders effective conservation measures from being developed. And I don't believe there's anything in the statute that precludes NIFS from considering all those factors in making its decision to authorize research. And, in fact, appellants have not disputed the data NIFS relied on. They didn't make any best science arguments, and they didn't even disagree with the analysis that was engaged in. They disagreed with the conclusion. What NIFS has decided will be a conservation benefit, they believe is jeopardy. So it's a very different interpretation of the same information. My time is actually up. You're giving me the 10 minutes to make a decision. I appreciate that. I'll make actually two more points. Two. Okay. With respect to Section 7A2 and that's the jeopardy standard, again, the conservancy is attempting to insert a certainty requirement that is not in the statute. On the contrary, Congress actually amended Section 7A2 to clarify that NIFS is not required to guarantee against jeopardy. It is required to guarantee against the likelihood of jeopardy. And that's an important distinction. When it made this amendment, Congress stated it did not intend NIFS to issue a negative opinion simply because there was some uncertainty, but rather it directed NIFS to rely on the best data and make an informed decision. And, again, that's what was done here. And the conservancy merely disagrees with the conclusion that was drawn. Finally, I think it's important for the court to understand that while the conservancy has framed its arguments here in terms of a dispute with the particular measures that NIFS chose to test, in fact, the district court particularly asked them, what changes could NIFS make to this permit to make it acceptable? And their counsel replied that no changes were permissible and that they would oppose this research if it involved any impact to any sea turtle. And, of course, in that case, no permit was needed. And I believe this might relate to their mootness argument that if they plan to challenge any permit that results in any sea turtle case, in that case, they will have a challenge and it will likely be on similar grounds. Again, I don't believe that means that there is merit to the mootness argument because the content of the permit is what would need to be the same in order to repeat those same errors. Finally, I'd just like to conclude by saying that a public position would preclude this research from occurring. It would effectively doom the species to extinction through ignorance. They've admitted that if no action is taken, the species is likely to come extinct. I do not believe that that is what Congress intended in enacting the NFA. Thank you very much. Counsel, we'll give you a very few minutes. Thank you. With respect to the issue that the counsel or the agency raised repeatedly, she said that we believe we're enjoined. And there was much discussion about how the agency supposedly is enjoined by the district court. And frankly, I'm amazed by this because you can read that district court order inside out in every which way and you will not find an injunction in it. We are here because the district court would not enjoin, not because it did. Apparently, they've invited us to enjoin or to clarify the district court. The only statement that I've come across in any paper in this case that sounds something like an injunction is the district court statement that the permit has been withdrawn and will not be reissued before an EIS is completed. And frankly, with all due respect, defendants have misrepresented this as an order from the court that the EIS has to come out before any permit is reissued. That was not the court's order. The court was merely stating, repeating the statement of the agency by saying, oh, we won't. And the court was saying, well, they said they won't. And that was good enough for the district court that that's an issue. But the district court has never said that the experiment will not proceed until an EIS is issued. So we need to make that very clear. Now, the government's counsel also made it very clear that the thing that they are most concerned about is this court offering any interpretations on the substantive question of the proper interpretation section 7 of the Endangered Species Act, which seems to me all but announces their intention to follow the same flawed analysis that they did last time. They practically announced that they intend to repeat their unlawful conduct in the sense of issuing another biological opinion which uses the same erroneous interpretation. That's why they have not wanted this court to say anything about it. They did not want the district court's opinion to be vacated even if it were determined that this case was moot. So far from an indication that their conduct will not be repeated, they basically said, yes, we're going to repeat it, so please don't say anything that will make it any more difficult for us. With regard to the Long Line Association's comments, I think that any time that industry makes an argument for turtle conservation in the face of vigorous opposition of three conservation groups, that should certainly set up some red flags. The fact is, Section 7, as interpreted the way that my clients have urged to be interpreted, and as I think the law clearly states, does not preclude research on critically endangered species. For one thing, there is an exemption process from Section 7. You can get an exemption even if the project is deemed to jeopardize a species. You go to the Endangered Species Committee, and if you can show that there is no reasonable alternative and the benefits of proceeding clearly outweigh the benefits of alternatives, presumably you will get an exemption from Section 7's Prohibition on Jeopardy from the Endangered Species Committee, and you may proceed. The government has never sought such an exemption. The problem with the interpretation that the government and the Long Line Association urge is that their interpretation would allow any number of mortalities of a critically endangered species simply by saying, well, if we don't do this, the species is doomed. There is no upper limit other than perhaps killing every last member of the species. They can say, look, these foreign forces are causing this terrible problem. We're just a little part of it, and if we don't do something, the species is doomed. Therefore, we need to cause a mortality of however many of these animals our scientists tell us are necessary in order to get statistical certainty about whether or not our proposed methods are successful. Just to find out if they're a failure, it's going to cost 107 turtles. What if their scientists said, well, the way we've designed this experiment, it's going to cost 200, 500 turtles? Suppose it had been two turtles. But it isn't. Suppose it works in turtles. In the context of this species, let's take the leatherback turtle. There is, as I quoted in my brief, a statement in the administrative record from a scientist within the National Fisheries Service saying that as they have previously opined in other biological opinions covering other fisheries that catch the same species of turtles, the leatherback is so endangered it cannot afford even one additional case. What's going to happen if there's no experiment? Your opposing counsel say you agree with them, that if nothing's done, the foreign fisheries are going to kill off the turtles. Is that right? I think that's very true. The question is, how do you do it, and do you follow the law, or do you brush the law under the rug? We think the law in this case is absolutely critical, that any experiment that proceeds strictly follow the law, in this case Section 7 of the Endangered Species Act, or the legal consequences could be disastrous. This is not to say that the experiment cannot go forward. As I said, it can easily go forward if they get an exemption from Section 7. I think, Kerry, that your position ultimately is probably that no experiment that will take turtles is viable under the Act. I would not prejudge that, Your Honor, with all due respect. How would you craft an experiment that, hypothetically, would be acceptable? I'll tell you a couple of them, or at least one. There is currently, in Hawaii, a longline fishery that catches tuna rather than swordfish. The swordfish component has been closed because it catches an inordinate number of turtles. The tuna fishery continues to this day. There are dozens of boats out there, as we speak, catching tuna and catching turtles. Now, I have been proposing, personally, to the National Marine Fisheries Service for about nine months, repeatedly. They have said they have a new method that they think is likely to reduce the bycatch of turtles. They want to try it. I said, well, you have a commercial fishery right now. Why don't you use half of your hooks to use this new hook you say is so great? You can start doing that tomorrow. My clients won't oppose it. You probably don't even need a permit to do it. You have an ongoing fishery. Just switch out half the hooks. Use your new hook and use your old hook and see what the results are. You can design an experiment to see what happens. If the fishermen resist because they're afraid they're not going to catch as many tuna with the new method, you can subsidize that. That shouldn't be a major problem here. They have refused. In fact, they have told me repeatedly, what you say makes sense. Why isn't it happening? Because this entire permit process is being pushed by the swordfish industry. It is not a conservation method. I understand that what you're saying now is they wouldn't do the swordfish fishing. That could solve the problem. But how does that help with the fact that almost all of this is happening with the foreign countries? What could it do to save them? Why don't you stop swordfish? Your Honor, the great majority of the foreign longline effort in the Pacific catches tuna. Not swordfish. The issue here is reducing turtle fly catching. It has nothing to do with affecting how much swordfish is caught. The question is, how do we reduce turtle fly catching? Most of the turtles are being caught on tuna longline. This project is being pushed by the swordfish industry in Hawaii because they want to reopen it. But if anyone is really curious about reducing turtle fly catching, they would start tomorrow utilizing the methods that they feel are promising in their ongoing tuna fisheries. There are also ongoing swordfish and tuna fisheries on the west coast of the United States, on the east coast of the United States. They could start using methods in those ongoing fisheries anytime they want. In fact, they have done this in the past. They have done it and they're doing it now. There are longline fishermen who have taken it upon themselves to try out new methods because it's in their interest to reduce turtle fly catching. And we have said repeatedly, why don't you do these things? They don't require you to jump through any procedural hoops. You have the fisheries going right now. You don't have to start a new one in an area from which you have banned swordfish longlining in order to do this. You're going to be catching turtles anyway in these existing fisheries. They do. Why don't you see if you can reduce that number that you're already catching by using a new method? There are no answers for coming to this question that I'm posing to you. The reason is that this effort is being pushed by the swordfish industry. And they have insisted we want an experimental fishery in Hawaii. We don't care about anything else. That's all right. You answered the question. There is an ongoing experimental longline fishery, and there has been for the last couple of years, up in New England, doing the exact same thing that the government wants to do out of Hawaii. We haven't objected to that. It's happening right now. Why do we need a second one? Great. Thank you, Chris. Thank you. Thank you all very much. Very interesting arguments. The case just argued will be submitted. The court will stand for the day.
judges: Browning, Reinhardt, Thomas